UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SAMUEL HARRIS, | Case No. C15-833-MJP-JPD |
| Plaintiff, | REPORT AND RECOMMENDATION |
| v. | |
| KING COUNTY PUBLIC HEALTH JAIL SERVICES, et al., | |
| Defendants. | |

## I.      INTRODUCTION AND SUMMARY CONCLUSION

Plaintiff Samuel Harris is an inmate at the Coyote Ridge Corrections Center in Connell, Washington.  He is proceeding *pro se* and *in forma pauperis* in this 42 U.S.C. § 1983 civil rights action against King County Public Health Jail Services and several medical providers who treated plaintiff over the course of his incarceration in the King County Correctional Facility Center ("KCCF" or "the jail") between December 2, 2013 and July 29, 2014.[1]  Dkt. 1, Ex. A at 3-16 (complaint); Dkt. 2 at 27-24 (order waiving state court filing fees).  Specifically, plaintiff

---

[1] The six King County employees named as defendants in plaintiff's complaint are Nurse Practitioner Debra Beckman, Nurse Cheri Murphy, Nurse Melissa Erdman, Nurse Michael Schroeder, Dr. Benjamin Sanders, and Dr. Roger Higgs.

REPORT AND RECOMMENDATION
PAGE - 1

alleges that the defendants denied him medically necessary prescription medication and medical equipment for a preexisting ankle injury, violating his federal constitutional rights and causing him extreme pain and suffering and permanent injury.  Dkt. 1, Ex. A at 11.

This matter comes before the Court on the defendants' amended motion for summary judgment, Dkt. 16, to which plaintiff has filed no opposition.  Having considered defendants' amended motion, plaintiff's lack of opposition, defendants' reply, the governing law, and the balance of the record, the Court RECOMMENDS that defendants' amended summary judgment motion, Dkt. 16, be GRANTED and plaintiff's claims be DISMISSED with prejudice.

## II.      BACKGROUND

### A.  Procedural Background

In his complaint, plaintiff alleges that he "suffered and continues to suffer unnecessarily severe pain and loss of function of his ankle" due to the fact that his severe ankle cellulitis "was left untreated . . . by [defendants'] negligence which left Mr. Harris['] condition worse and required his hospitalization at HMC."  Dkt. 1, Ex. A at 7.  Plaintiff contends that the defendants' decisions were "so egregiously bad that they were not based on sound medical judgment" and "constitute[d] deliberate indifference" in violation of his Eighth Amendment rights.  *Id.*  He alleges that defendants' misconduct has caused him serious, permanent, ongoing and increasing pain and suffering, "the mental stress of which compounded with my mental illness has caused depression, auditory hallucinations, potential sexual difficulties, and the permanent prospect of never being able to be gainfully employed again."  *Id.*  Defendants removed this case from the King County Superior Court on May 28, 2015.  Dkt. 1.

1   The defendants filed their initial motion for summary judgment on October 9, 2015.  Dkt.

2   7.  Plaintiff did not file a responsive brief.  Dkt. 13.  After carefully reviewing defendants'

3   motion and supporting declarations, the Court struck defendants' submissions by Order dated

4   November 18, 2015 after discovering a significant discrepancy between defendants'

5   characterization of certain medical evidence and the actual chart notes from Jail Health Services

6   ("JHS") during plaintiffs' incarceration at KCCF in early December 2013.  Dkt. 14.

7   Specifically, the Court found that contrary to defendants' representation that plaintiff was

8   deliberately noncompliant with medical advice by failing to take his prescribed antibiotic

9   medication, JHS nursing progress notes revealed that plaintiff was never given his prescribed

10   antibiotics by JHS nursing staff following his discharge from Harborview on December 5, 2013,

11   and these medications were later found "in the med room still unopened, not given to inmate."

12   Dkt. 10, Ex. 5 at 11.  This discovery was deeply troubling to the Court because "[d]efendants are

13   clearly intricately familiar with the medical records at issue in this case, as they cite to them

14   extensively throughout their motion for summary judgment."  Dkt. 14 at 4.  The Court directed

15   defendants to file a response explaining the discrepancy between their representations and the

16   corresponding medical records, and to review the medical records again and confirm that no

17   similar discrepancies exist in this case.  *Id.* at 5.

18   On December 10, 2015, the copy of the Court's November 18, 2011 Order sent to

19   plaintiff was returned to the Court by the U.S. Post Office as "undeliverable" with a notation that

20   it was "Refused by Offender."  Dkt. 15.  The Clerk of the Court then re-mailed the Order on

21   December 14, 2015.  *Id*.  The Court's mail was once again returned to the Court with a notation

22   indicating that it was "Refused by Offender" on December 29, 2015.  Dkt. 23.

23

1        On December 18, 2015, defendants filed the instant Amended Motion for Summary

2  Judgment and Response to the Court's November 18, 2015 Order.  Dkt. 16.  Specifically,

3  defendants explained that their previous motion "relied upon the medical expertise of the

4  medical record review of Dr. Sanders," who had mistakenly never reviewed the Jail Health

5  Services ("JHS") chart notes identified by the Court.  *Id*. at 1.  Dr. Sanders has worked as a

6  family medicine physician for JHS since 2001, and served as its Medical Director since 2004.

7  *See* Dkt. 18 (Amended Sanders Decl.). at ¶ 3.  Thus, Dr. Sanders supervises the JHS staff of

8  medical providers as well as provides direct clinical care to inmates.  *Id*. at ¶ 4.  Dr. Sanders

9  explains that defendants' error was due to a difference between the electronic medical records

10  and the incomplete printed version of the medical records that he had previously reviewed, and

11  inferences made from a medication order transcription error in the medical records.  *See* Dkt. 18

12  (Amended Sanders Decl.). at ¶¶ 13-19.  Defendants assure the Court that Dr. Sanders has now

13  reviewed the full medical record in electronic form, and there are no similar errors in defendants'

14  current submission to the Court.  Dkt. 16 at 2.

15        After the defendants advised the Court by telephone that they received a notification from

16  the U.S. Postal Service that plaintiff had refused to accept a copy of their Amended Motion for

17  Summary Judgment at the prison, the Court issued a Notice to Plaintiff Regarding Rejection of

18  Mail and Pending Summary Judgment Motion on January 13, 2016.  Dkt. 24.  The Court

19  reminded plaintiff that his failure to respond and submit his own evidence to oppose defendants'

20  motion will likely result in dismissal of this action without a trial.  *Id*. at 2.  The Court also

21  granted plaintiff an unsolicited three-week extension of time to review the recent filings and file

22  a response to defendants' motion.  *Id*.  On January 26, 2016, this Order was also returned to the

23  Court with a notation indicating that it was "Refused by Offender."  Dkt. 25.

REPORT AND RECOMMENDATION
PAGE - 4

1    To date, plaintiff has failed to file any response or opposition to defendants' amended

2    motion for summary judgment.  Defendants filed a reply on February 4, 2016.  Dkt. 26.

3         B.  <u>Factual Background</u>

4         Prior to plaintiff's incarceration at KCCF from December 2, 2013 to July 29, 2014,

5    plaintiff spent two nights at Harborview Medical Center ("Harborview") from November 29,

6    2013 to December 1, 2013 for an ankle injury that he said he sustained by falling approximately

7    two feet from a ladder.  Dkt. 18 (Am. Sanders Decl.) at ¶¶ 5, 8; Dkt. 18, Ex. 1 at 3 (Harborview

8    discharge form).  Plaintiff had used duct tape to stabilize the ankle, but when he tried removing

9    the tape the adhesive tore the skin and led to infection.  Dkt. 18 (Am. Sanders Decl.) at ¶ 8.  He

10   was diagnosed with a low ankle sprain/inversion injury, swelling, as well as cellulitis, which is a

11   spreading bacterial infection of the skin and tissues beneath the skin.  *Id.*; Dkt. 18, Ex. 1 at 4

12   (Harborview discharge form).  Upon discharge from Harborview, he was given a one week

13   supply of Oxycodone (5 mg) for pain management, a 10-day course of antibiotics, a stool

14   softener medication, and an antidepressant, and was provided with crutches and a CAM boot for

15   ankle stabilization.  Dkt. 18 (Am. Sanders Decl.) at ¶ 7; Dkt. 18, Ex. 1 at 5 (Harborview

16   discharge form).  He was advised not to bear weight on the foot for at least one week, ideally

17   through the time of orthopedics follow-up, and to keep the leg elevated.  Dkt. 18, Ex. 1 at 5

18   (Harborview discharge form).

19        Plaintiff was booked into the KCCF on December 2, 2013.  He told the intake nurse,

20   defendant Cheri Murphy, that he had "rolled his ankle" and had been seen at Harborview where

21   IV antibiotics had been administered.  Dkt. 18 (Am. Sanders Decl.) at ¶ 9; Dkt. 18, Ex. 2 at 2

22

23

1    (Nurse Murphy's chart notes).[2]  He also told her that he had been given antibiotics, pain

2    medication, an ankle stabilization boot, and crutches at discharge.  Dkt. 18, Ex. 2 at 2.  Nurse

3    Murphy observed that plaintiff's ankle was swollen and bruised, scrapes and abrasions were

4    visible on his heel and shin, plaintiff was unable to put on his shoe, and ambulating was difficult.

5    *Id.* at 2.  She also observed that plaintiff was bleeding, and in "observable pain."  *Id.* at 2.  Nurse

6    Murphy verified plaintiff's medications and ordered plaintiff a combination antibiotic,

7    trimethoprim/sulfamethoxazole "double strength" (Bactrim DS) for his cellulitis, and a

8    combination pain medication, hydrocodone/acetaminophen (Vicodin) for his pain.  Dkt. 18 (Am.

9    Sanders Decl.) at ¶ 9; Dkt. 18, Ex. 2 at 2-4.  The Bactrim DS was ordered "Keep on Person" or

10   "KOP", meaning that plaintiff would be self-administering the medication once the prescription

11   was filled by the pharmacy and delivered to him.  Dkt. 18 (Am. Sanders Decl.) at ¶ 9.  The

12   Vicodin was ordered "Single Dose" or "SD", meaning that JHS staff would be administering the

13   medication.  *Id*.  Nurse Murphy also ordered a pair of crutches for plaintiff.  Dkt. 18, Ex. 2 at 2-

14   3, 11.

15        Nurse Murphy scheduled plaintiff to visit the infirmary for treatment of his ankle, and

16   cleaned and dressed his ankle and calf.  She requested that his vital signs be checked twice a

17   week for two weeks, and filled out paperwork for his transfer to the medical floor with his

18   crutches and a lower tier lower bunk.  *Id*. at 3.  Finally, she requested that plaintiff's mental

19   health medications be reviewed and filled by psychiatric staff.  *Id*.

20        JHS pharmacy service standards dictate that medications ordered "KOP" before 1:00pm

21   will be dispensed and available for delivery by the evening of the same day.  The KOP order for

22   _____

23        [2] Defendants have not provided a declaration from Nurse Murphy in support of their
     motion.  However, they have provided copies of her chart notes relating to plaintiff.

1  the antibiotic, Bactrim DS, was placed on December 3, 2014 at 12:40 a.m., so the antibiotic

2  should have been delivered to the patient on the evening of December 3 so that his first available

3  dose could be taken that evening.  In his Amended Declaration, Dr. Sanders concedes that under

4  the circumstances, it would have been preferable that plaintiff's Bactrim DS had been ordered

5  differently so that plaintiff could have received the first dose more quickly than the evening of

6  December 3.  He explains, "although only one dose of Bactrim DS would have been possible to

7  administer on December 3, 2013 at the standard morning medication pass before Mr. Harris was

8  transferred back to Harborview, it would have been more optimal to order the medication as

9  single dose, using the additional instruction 'start today' or 'ASAP' to indicate that the patient

10 would need to start the medication in advance of the evening of December 3, 2013."  Dkt. 18

11 (Am. Sanders Decl.) at ¶ 10.

12     On the morning of December 3, 2013, defendant Nurse Michael Schroeder provided

13 plaintiff with a dose of Oxycodone, ordered him a pair of crutches, and gave plaintiff a CAM

14 walking boot.   Dkt. 19 (Schroeder Decl.) at ¶ 5.  Nurse Schroeder also requested that plaintiff be

15 housed on the lower level of his housing unit with a lower bunk and an extra blanket to be used

16 to elevate his foot.  *Id*.; Dkt. 19, Ex. A at 2 (chart notes).

17     On December 3, 2013 around 6:35pm, defendant Nurse Melisa Erdman responded to a

18 deck call regarding Mr. Harris.  Dkt. 21 (Erdman Decl.) at ¶ 5.  His tank mates were concerned

19 because his ankle appeared to be bleeding.  *Id.*  Nurse Erdman examined plaintiff, and noted

20 lower left extremity swelling, blisters, and increased pain to even light touch.  *Id.*  She spoke to a

21 provider and ordered a clinic appointment for him that night.  *See* Dkt. 21, Att. A at 2 (Erdman

22 chart notes).

23

REPORT AND RECOMMENDATION
PAGE - 7

About forty-five minutes later, around 7:15pm, plaintiff was seen in the clinic by Dr. Jones-Vanderleest, who observed swelling of plaintiff's right calf with bright red erythema about halfway up from his ankle. Dkt. 18 (Am. Sanders Decl.) at ¶ 11.  Based on this observation, coupled with plaintiff's report of increasing pain, Dr. Jones-Vanderleest sent plaintiff back to the Harborview Emergency Room for reassessment and possible change in treatment plan recommendations.  Dkt. 18, Ex. 3 at 3 (Jones-Vanderleest chart notes).

Plaintiff was admitted at Harborview late that same night, in the early morning hours of December 4, 2013.  Dkt. 18 (Am. Sanders Decl.) at ¶ 12; Dkt. 18, Ex. 4 (Harborview chart notes).  The chart notes indicate that "[u]pon discharge [on December 1, 2013], he took a few doses of his prescribed Bactrim DS and was not fully adherent to his activity precautions.  He was arrested and brought to KCJ on 12/2 where he then missed his antibiotic doses." Dkt. 18, Ex. 4 at 2.  The chart note indicates that "[h]e believes he missed 2-3 doses.  On the morning of 12/3 he reports worsened pain, increasing redness and swelling over his left foot with redness approaching the margins drawn on his last admission.  Therefore, he was brought to HMC for further eval from KCJ." *Id.* The chart notes further indicate that the worsening of plaintiff's symptoms was "likely due to med non-adherence, though failure to oral agent also possible." *Id.* at 9.

Plaintiff returned to KCCF from Harborview admission at approximately 3:00 p.m. on December 5, 2013, where he was evaluated by a nurse in the intake area, Lio Saephanh.  Dkt. 18 (Am. Sanders Decl.) at ¶ 13; Dkt. 18, Ex. 5 at 9 (chart notes).  Nurse Saephanh contacted the medical provider on call and received medication orders for Vicodin for pain, docusate (a stool softener) to avoid constipation, and Bactrim DS for continued treatment of plaintiff's infection.  All of these orders contained a special instruction, "start today," implying that all orders should

have been entered as "SD."  Dkt. 18, Ex. 5 at 10.  However, the docusate and Bactrim DS were

erroneously entered as "KOP," a medical transcription error.  *Id.*[3]  JHS pharmacy standards

dictate that KOP orders placed after 1:00 p.m. will be dispensed and available for delivery by the

evening of the following day, which in this case would have been December 6, 2013.

Consequently, the entry of the Bactrim DS order as "KOP" would apparently delay plaintiff's

receipt of the first dose until approximately 24 hours after the order was placed.  Dkt. 18 (Am.

Sanders Decl.) at ¶ 14.

At 9:50 a.m. on December 6, 2013, plaintiff was examined by defendant ARNP Debra

Beckman as follow up after his admission to Harborview.  *See* Dkt. 17 (Beckman Decl.) at ¶ 4;

Dkt. 17, Ex. A (chart notes).  Nurse Beckman ordered an orthopedic follow up appointment for

plaintiff to be seen at the wound care clinic in the jail, and noted some difference in skin color on

the right calf but documented that he was "on antibiotics and pain medications."  Dkt. 18 (Am.

Sanders Decl.) at ¶ 15.[4]  She also prescribed Ibuprofen that plaintiff could take in addition to

Vicodin for his pain.  *See* Dkt. 17 (Beckman Decl.) at ¶ 5; Dkt. 17, Ex. A at 4.

Later in the day on December 6, 2013, plaintiff was seen a third time at Harborview for

reported worsening ankle pain and swelling.  Dkt. 18 (Am. Sanders Decl.) at ¶ 16; Dkt. 18, Ex. 5

---

[3] Dr. Sanders explains that this transcription error led to defendants' erroneous assumption, in their initial motion for summary judgment, that plaintiff had actually received antibiotics "when in fact there was only an active order for antibiotics" and plaintiff had not received them.  Dkt. 18 (Am. Sanders Decl.) at ¶ 13.

[4] Although Nurse Beckman was unaware of the transcription error at the time she prepared her declaration in October 2015, Dr. Sanders explains that Nurse Beckman likely assumed, as he did, that plaintiff was receiving his medications based on the fact that there was an active order with "start today" instructions.  Dkt. 18 (Am. Sanders Decl.) at ¶ 15.  In her declaration, Nurse Beckman simply states that plaintiff was taking "a generic form of Bactrim, a combination antibiotic to treat the infection of his ankle."  *See* Dkt. 17 (Beckman Decl.) at ¶ 5.

REPORT AND RECOMMENDATION
PAGE - 9

1   (Harborview chart notes).[5]   Plaintiff reported to Harborview staff that he had not received any

2   pain medication or antibiotics since his last Harborview discharge apart from two Vicodin earlier

3   that day, that he had not had his ankle dressings changed, and that he did not have a pillow to

4   elevate his foot and therefore the swelling had increased.  Dkt. 18, Ex. 5 at 3-5 (Harborview

5   chart notes).  In response to plaintiff's reports, supervising physicians at Harborview contacted

6   the King County Jail Infirmary.  The chart notes reflect that "[p]er the nurse on duty, the patient

7   is being given his Vicodin observed, *but his antibiotics and other medications have been given to*

8   *him to be taken on his own.*  The nurse could not locate the bottle in his room for a pill count, but

9   it seems that the patient has deliberately been not taking his antibiotics and antidepressants while

10  in jail.  The infirmary nurse confirmed that all medications can be written to be taken under

11  observation, and that elevation supplies are readily available."  Dkt. 18, Ex. 5 at 6 (emphasis

12  added).  Thus, the Harborview physician was mistakenly informed by JHS staff that plaintiff had

13  been given his Bactrim DS to take on his own, but was choosing not to take his medication.  As a

14  result, to ensure medication compliance in the future, plaintiff's discharge order from

15  Harborview medical staff provides that all plaintiff's prescriptions need to be directly observed

16  in the future.  *Id.* at 7 ("BACTRIM BID MUST BE OBSERVED THERAPY.  DO NOT GIVE

17  THESE TO THE PATIENT TO TAKE HIMSELF.  HE HAS PREVIOUSLY STATED THAT

18  HE WAS NOT GIVEN HIS MEDICATIONS.").  The discharge order further provides that

19  
_____

20      [5] There appear to be some missing JHS medical health records relating to the medical
    care plaintiff received from JHS staff prior to his transport back to Harborview on December 6,
    2013.  Dr. Sanders notes in his declaration that "there is no documentation in the JHS health

21  record of an assessment leading to transport to Harborview, so it is unclear on review of the
    electronic health record what was the clinical assessment leading to transport."  Dkt. 18 (Am.

22  Sanders Decl.) at ¶ 16.  Plaintiff appears to suggest in his complaint that he was "under the care
    of Casey Dooley RN when he was transported by ambulance to HMC for increased pain and

23  swelling."  Dkt. 2, Ex. A at 6.

plaintiff's "foot should be elevated whenever the patient is seated or lying down.  Use a wedge, pillow, or blanket roll for foot elevation."  *Id.*

JHS Nursing Progress Notes by Nurse Casey Dooley from the early morning hours of December 7, 2013 also reflect the phone contact with the Harborview Emergency Room physician.  Dkt. 18, Ex. 5 at 11 (JHS nursing progress notes dated December 7, 2013 at 2:47 a.m., describing a telephone contact that took place around 12:30 a.m.).  The nursing progress notes provide that "[w]hile discussing [patient] management on phone w/ER physician, notified her that our MAR documents 5 doses of administered vicodin since [patient's] discharge on 12/5/13, and *prescribed Bactrim given KOP*."  *Id*. (emphasis added).[6]  However, after returning plaintiff to his hospital bed in the KCCF infirmary, the nurse noted that she was "[u]nable to find bactrim KOP at bedside.  Upon further investigation, *bactrim KOP bottle found in med room still unopened, not yet given to inmate.*  Docusate also present, docusate given to inmate, bactrim not given [due to] order changed from KOP to SD."  Dkt. 18, Ex. 5 at 11 (emphasis added).

Having identified the transcription error in plaintiff's medical records which caused various medical providers to fail to realize that plaintiff had not been administered his prescribed Bactrim DS, Nurse Dooley followed the Harborview "ER provider recommendation and [obtained] verbal consent from on-call provider Ledgerwood" to change the "bactrim order . . . from KOP to SD to ensure med administration and compliance."  *Id.  See also* Dkt. 18, Ex. 5 at 13-14 (nursing progress note reflecting that Nurse Dooley obtained permission to change medication from KOP to SD per consult with Nancy Ledgerwood, ARNP).  By obtaining

---

[6] The nurse then summarizes plaintiff's current medication status since his discharge from Harborview a few hours earlier around midnight on December 6, 2013, noting that because plaintiff "received a PO dose of Bactrim prior to discharge, next dose not due until 12/7/13 at 10am.  Also, per our records inmate did not miss any evening meds and is current on prescribed pain medications."  Dkt. 18, Ex. 5 at 11.

REPORT AND RECOMMENDATION
PAGE - 11

permission to change the order from Keep on Person (KOP) to Single Dose (SD), meaning that plaintiff must be dispensed his antibiotics under direct observation in the future, Nurse Dooley apparently resolved the problem.  Dkt. 18, Ex. 5 at 11-12.

Thus, it appears that plaintiff missed at least three doses of his prescribed antibiotics during approximately eleven days of therapy as a result of the transcription error and/or incorrect assumptions by KCCF medical providers.  Specifically, plaintiff did not receive his prescribed antibiotics a few hours after booking into the facility on the morning of December 3, 2013, the evening of December 5, 2013, or the morning of December 6, 2013.[7]  As noted above, Nurse Dooley corrected the error around approximately 3:00 a.m. on December 7, 2013, shortly after plaintiff returned to the facility from Harborview.  When plaintiff was returned to Harborview after his December 6, 2013 visit, plaintiff did not evince such clinical worsening as a result of the final two missed doses as to require re-admission to the hospital.  Dkt. 18 (Am. Sanders Decl.) at ¶ 16.

There is no evidence, from that point forward, that plaintiff had any further difficulty obtaining his prescribed medications or other recommended treatment during his incarceration at KCCF.  For example, defendants provide substantial evidence that plaintiff received his prescribed doses of Vicodin for pain relief without difficulty, and had his ankle dressings changed daily by JHS staff.  Dkt. 18 (Am. Sanders Decl.) at ¶ 16.  He was also provided with a means to elevate his leg – a medical bed with mechanical foot raising capability as well as an extra blanket to fold and place under his leg.  *Id.*[8]

---

[7] Plaintiff did receive his Bactrim DS in the emergency department at Harborview on the evening of December 6, and he was returned to KCCF just after midnight on December 7. Dkt. 18 (Am. Sanders Decl.) at ¶ 16.

[8] There is, meanwhile, some evidence that plaintiff was observed to be somewhat non-

A medical review of plaintiff's condition was conducted by defendant Dr. Roger Higgs on the morning of December 8, 2013 to determine why plaintiff's condition had previously failed to improve. Dkt. 18, Ex. 6 at 2.[9] As Dr. Sanders points out in his Amended Declaration, it apparent from Dr. Higgs' notes that he failed to understand that plaintiff's prior representations to Harborview staff that he had not been given his antibiotics between December 5 and 6 had been true. *See* Dkt. 18 (Am. Sanders Decl.) at ¶ 19. Dr. Higgs' notes reflect his mistaken impression that plaintiff had actually been given the antibiotic KOP, and was therefore responsible for failing to take his medication. *See* Dkt. 18, Ex. 6.

However, despite Dr. Higgs' failure to recognize the error that had taken place, the evidence shows that plaintiff continued to receive appropriate care during the remainder of his incarceration and his condition gradually improved. Dr. Higgs noted that plaintiff was housed in the infirmary and "provided a hospital type bed with easy mechanism to raise the feed. Vicodin was being dispensed regularly. Septra has been changed to SD." Dkt. 18, Ex. 6 at 2. Plaintiff's medical records further reflect that he was housed in the jail infirmary from December 5, 2013 until December 14, 2013, when he was deemed medically able to return to the general population housing. Dkt. 18 (Am. Sanders Decl.) at ¶¶ 18, 20; Dkt. 18, Ex. 7 (nursing progress note reflecting move "due to no medical need to be in the infirmary"). After his last Harborview orthopedic appointment on December 23, 2013, no further follow up appointments were ordered. *Id*. Other than periodic complaints of ankle pain in May 2014 and July 2014, which were treated with acetaminophen, plaintiff reported no other difficulty with his ankle during his incarceration.

---

compliant with some of his discharge instructions regarding the use of his crutches, as he was observed by JHS staff walking on his CAM boot without using his crutches. Dkt. 18 (Am. Sanders Decl.) at ¶ 16; Dkt. 18, Ex. 5 at 9.

[9] Defendants did not provide a declaration from Dr. Higgs in support of their motion for summary judgment.

REPORT AND RECOMMENDATION
PAGE - 13

III.     DISCUSSION

A.  Parties' Contentions

As noted above, plaintiff alleges violation of 42 U.S.C. § 1983 by various King County defendants related to plaintiff's medical treatment in jail during his incarceration at KCCF.  Dkt. 1, Ex. A.  Specifically, plaintiff asserts that his prescribed medications were not administered "for over a week, showing an indifference to the mental anguish and suffering of a man with bi-polar [disorder], who has been arrested for the first and only time, and refusing him the medication which was verified at the time of booking.  JHS Medication Administration Record shows JHS refusal to give other prescribed medications." *Id*. at 7.  Plaintiff also alleges that KCCF employees were improperly hired, trained, and supervised by defendants Dr. Roger Higgs and Medical Director Dr. Sanders, who are both in supervisory positions.  *Id.*

Defendants respond that plaintiff's claims against King County should be dismissed because plaintiff has provided no evidence that King County has an unconstitutional pattern, policy, practice, or custom that caused the harm plaintiff alleges in his complaint.  Dkt. 16 at 12-13.  Defendants further contend that plaintiff's claims against the named defendants Debra Beckman, Melissa Erdman, Cheri Murphy, Michael Schroeder, and Roger Higgs must be dismissed because plaintiff has not provided any evidence that they acted with deliberate indifference to plaintiff's serious medical needs.  *Id*. at 13-15.  In addition, defendants contend that Dr. Sanders did not directly provide any medical care to plaintiff, and as medical director Dr. Sanders did not direct, or fail to prohibit, any action by JHS employees that caused a violation of plaintiff's constitutional rights.  *Id*. at 15-16.  Finally, defendants assert that they are entitled to qualified immunity.  *Id*. at 16-17.

B.  <u>Summary Judgment and § 1983 Standards</u>

Summary judgment "shall be entered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue of fact is "genuine" if it constitutes evidence with which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  That genuine issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

When applying these standards, the Court must view the evidence and draw reasonable inferences in the light most favorable to the non-moving party. *See United States v. Johnson Controls, Inc.*, 457 F.3d 1009, 1013 (9th Cir. 2006).  The moving party can carry its initial burden by producing evidence that negates an essential element of the nonmoving party's claim, or by establishing that the nonmoving party does not have enough evidence of an essential element to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once this has occurred, the procedural burden shifts to the party opposing summary judgment, who must go beyond the pleadings and affirmatively establish a genuine issue on the merits of the case. Fed. R. Civ. P. 56(e).  The nonmovant must do more than simply deny the veracity of everything offered by the moving party or show a mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The mere existence of a scintilla of evidence in support of the plaintiff's position is likewise insufficient to create a genuine factual dispute. *Anderson*, 477 U.S. at 252.  To avoid summary judgment, the nonmoving party must, in the words of Rule 56, "set forth specific facts showing

1   that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The nonmoving party's failure of

2   proof concerning an essential element of its case necessarily "renders all other facts immaterial,"

3   creating no genuine issue of fact and thereby entitling the moving party to summary judgment.

4   *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

5        In order to state a claim for relief under 42 U.S.C. § 1983, a plaintiff must set forth the

6   specific factual bases upon which he claims each defendant is liable.  *Aldabe v. Aldabe*, 606 F.2d

7   1089, 1092 (9th Cir. 1980).  Specifically, a plaintiff must show (1) that he suffered a violation of

8   rights protected by the Constitution or created by federal statute, and (2) that the violation was

9   proximately caused by a person acting under color of state or federal law.  *See Crumpton v.*

10  *Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  To satisfy the second prong, a plaintiff must allege

11  facts showing how individually named defendants caused or personally participated in causing

12  the constitutional or statutory violations alleged in the complaint.  *See Arnold v. IBM*, 637 F.2d

13  1350, 1355 (9th Cir. 1981).

14              C.  Legal Standard for Deliberate Indifference to Serious Medical Needs

15       The Eighth Amendment's prohibition against cruel and unusual punishment/deliberate

16  indifference to serious medical needs does not directly apply to pretrial detainees, but only

17  applies after conviction and sentence.  *See Graham v. Connor,* 490 U.S. 386, 392 n. 6, 109 S.Ct.

18  1865, 104 L.Ed.2d 443 (1989).  However, the Supreme Court has held that "[p]retrial detainees,

19  who have not been convicted of any crimes, retain at least those constitutional rights that we

20  have held are enjoyed by convicted prisoners." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861,

21  60 L.Ed.2d 447 (1979).  Thus, while the Eighth Amendment proscribes cruel and unusual

22  punishment for convicted inmates, the Due Process Clause of the Fourteenth Amendment

23  proscribes any punishment of pretrial detainees.  *See Redman v. County of San Diego,* 942 F.2d

REPORT AND RECOMMENDATION
PAGE - 16

1435, 1441 n.7 (9th Cir. 1991).  Interpreting the Supreme Court precedent, the Ninth Circuit has

concluded that the deliberate indifference standard applies to claims that correction facility

officials failed to address the medical needs of pretrial detainees.  *Clouthier v. County of Contra*

*Costa,* 591 F.3d 1232, 1242–43 (9th Cir. 2010); *Frost v. Agnos,* 152 F.3d 1124, 1128 (9th Cir.

1998).  Accordingly, the Court construes plaintiff's deliberate indifference claims as Fourteenth

Amendment due process claims, subject to Eighth Amendment standards.

      To set forth a constitutional claim under the Eighth Amendment predicated upon the

failure to provide medical treatment, first the plaintiff must show a serious medical need by

demonstrating that failure to treat a prisoner's condition could result in further significant injury

or the unnecessary and wanton infliction of pain.  Second, a plaintiff must show the defendant's

response to the need was deliberately indifferent.  *Lemire v. California Dept. of Corrections and*

*Rehabilitation,* —— F.3d ——, 2013 WL 4007558 (9th Cir. 2013).  The "deliberate indifference"

prong requires (a) a purposeful act or failure to respond to a prisoner's pain or possible medical

need, and (b) harm caused by the indifference.  *Jett v. Penner,* 439 F.3d 1091, 1096 (9th Cir.

2006).

      Indifference may appear when prison officials deny, delay or intentionally interfere with

medical treatment, or it may be shown in the way in which prison officials provide medical care.

*Jett,* 439 F.3d at 1096.  The indifference to a prisoner's medical needs must be substantial.  Mere

indifference, negligence, or medical malpractice will not support this claim.  *Broughton v. Cutter*

*Labs.,* 622 F.2d 458, 460 (9th Cir. 1980); *Estelle v. Gamble,* 429 U.S. 97, 105–06, 97 S.Ct. 285,

50 L.Ed.2d 251 (1976).  Even gross negligence is insufficient to establish deliberate indifference

to serious medical needs.  *Wood v. Housewright,* 900 F.2d 1332, 1334 (9th Cir. 1990).

D.  <u>King County</u>

Plaintiff has failed to establish a genuine issue of material fact regarding the constitutionality of King County's medical care policies.  King County cannot be held liable under a theory of *respondeat superior*, and therefore plaintiff must show that a King County policy, pattern, practice, or custom violated his civil rights.  *See Leatherman v. Tarrent County*, 507 U.S. 163, 166, 113 S. Ct. 1160, 122 L.Ed.2d 517 (1993) ("In short, a municipality can be sued under § 1983, but it cannot be held liable unless a municipal policy or custom caused the constitutional injury.").

Here, plaintiff has failed to plead any facts demonstrating that King County possesses a policy, practice, or custom that evidences its deliberate indifference to the health or safety of the inmates in its jails.  In addition, there are no facts showing that any of the defendants were so inadequately trained by King County as to create *respondeat superior* liability for the County. Defendants have provided substantial evidence that plaintiff was denied three doses of his prescribed antibiotic medication as a result of a medical transcription error, which was corrected as soon as it was discovered.  Defendants have also shown that plaintiff received extensive care for his medical condition, including frequent trips to Harborview and an extended stay in the jail infirmary, until his condition improved.  As plaintiff has declined to present any evidence or argument to the contrary, defendants' facts are accepted as undisputed.  Accordingly, plaintiff has failed to raise a genuine issue of material fact that defendant King County was deliberately indifferent to plaintiff's serious medical needs, and King County is entitled to summary judgment.

E.   <u>Debra Beckman, Melissa Erdman, Cheri Murphy, Michael Schroeder,</u>
     <u>and Roger Higgs</u>

Plaintiff has also failed to raise a genuine issue of material fact that defendants Debra

Beckman, Melissa Erdman, Cheri Murphy, Michael Schroeder, or Dr. Roger Higgs were

deliberately indifferent to his serious medical needs.  As noted above, a provider of prison

medical services acts with deliberate indifference only if the provider knows of, and disregards,

an excessive risk to inmate health and safety.  *See Gibson v. Count of Washoe, Nevada*, 290 F.3d

1175, 1187 (9th Cir. 2002).  Under this standard, the provider must not only "be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists," but that

person "must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Most

significantly, "mere negligence in diagnosing or treating a medical condition, without more, does

not violate a prisoner's Eighth Amendment rights."  *Toguchi v. Chung*, 291 F.3d 1051, 1057 (9th

Cir. 2004).  Similarly, a difference of opinion between patient and provider as to diagnosis or

treatment does not state a claim under section 1983.  *Shields v. Kunkel*, 442 F.2d 409, 410 (9th

Cir. 1971).[10]

Here, defendants have conceded that plaintiff was denied three doses of his prescribed

antibiotic medication as a result of medication transcription errors by KCCF medical providers.

*See* Dkt. 16 at 15.  However, defendants have also demonstrated that JHS staff took plaintiff's

ankle injury seriously by providing him with crutches and a special bed to elevate his ankle, an

extra blanket for added elevation, regularly changing his wound dressings, consistently providing

---

[10] Although the precise nature of plaintiff's claim is unclear, as he was provided with
either Oxycodone or Vicodin for pain by different medical providers, he also appears to argue in
his complaint that he should have been given a certain type of prescription pain killer.  This
claim lacks merit.  The law is well settled that a prisoner does not have an unfettered right to
choose his preferred course of treatment, especially with respect to prescription pain medication.

REPORT AND RECOMMENDATION
PAGE - 19

doses of prescription strength pain medication, and repeatedly sending plaintiff to Harborview

for treatment and follow up care.  *See* Dkt. 18 (Am. Sanders Decl.); Dkt. 19 (Schroeder Decl.);

Dkt. 21 (Erdman Decl.); Dkt. 17 (Beckman Decl).  As discussed in detail above, as soon as

Nurse Dooley discovered the medical transcription error that resulted in the missed doses on

December 5 and 6, she took steps to ensure that plaintiff would be dispensed his antibiotics

under direct observation in the future.  Dkt. 18, Ex. 5 at 11-12.  Plaintiff's medical records show

that his condition improved after approximately eleven days of antibiotic therapy, which

defendants' assert is a fairly standard clinical course.  Dkt. 18 (Am. Sanders Decl.) at ¶ 23.

Plaintiff has declined to present any evidence or argument to contradict defendants' version of

events or show that he suffered increased harm as a direct result of the three missed antibiotic

doses, and therefore the Court must accept defendants' facts as undisputed.

Accordingly, although errors by JHS staff caused plaintiff to miss three doses of his

antibiotic medication, medical malpractice-negligence in treating a condition or inadvertent

failure to provide adequate medical care do not rise to the Eighth Amendment level.  Plaintiff has

failed to show that the actions of Nurse Practitioner Beckman, Nurse Erdman, Nurse Murphy,

Nurse Schroeder, and Dr. Higgs in treating his condition rose to the level of deliberate

indifference.  Plaintiff's constitutional claims against these individual defendants are dismissed.

### F.  Dr. Sanders

Finally, plaintiff has failed to raise a genuine issue of material fact that Dr. Sanders acted

with deliberate indifference to plaintiff's serious medical needs.  Plaintiff does not allege that Dr.

Sanders provided any direct medical care to plaintiff during his incarceration at KCCF, and Dr.

Sanders asserts that he did not personally treat the plaintiff.  *See* Dkt. 18 (Am. Sanders Decl.).

Thus, plaintiff's claims against Dr. Sanders appear to be based upon Dr. Sander's role as Medical

1   Director.  However, an individual acting in a supervisory capacity may only be liable if he

2   participated in the violations, or if he directed or failed to prohibit actions by others which he

3   knew or reasonably should have known would cause a violation of constitutional rights.  *See*

4   *Larez v. City of Los Angeles*, 946 F.2d 630, 645-46 (9th Cir. 1991).  Here, plaintiff has not

5   provided any evidence that Dr. Sanders directed, or failed to prohibit, any actions of employees

6   that violated plaintiff's rights.  As discussed above, there is no evidence that any of the

7   defendants violated plaintiff's rights by acting with deliberate indifference to plaintiff's serious

8   medical needs.  Rather, the missed doses of antibiotics over the course of plaintiff's stay at

9   KCCF appear to have been inadvertent, and his condition did ultimately improve.

10      Accordingly, plaintiff's claims against Dr. Sanders are also dismissed.  In light of this

11  conclusion, the Court need not address defendants' alternative argument that the defendants are

12  entitled to qualified immunity.  *See* Dkt. 16 at 16.

13                      IV.      CONCLUSION

14      For the foregoing reasons, the undersigned recommends that defendants' amended

15  motion for summary judgment, Dkt. 16, be GRANTED and plaintiff's claims be DISMISSED

16  with prejudice.  A proposed order accompanies this Report and Recommendation.

17      Objections to this Report and Recommendation, if any, should be filed with the Clerk and

18  served upon all parties to this suit by no later than **March 10, 2016**.  Failure to file objections

19  within the specified time may affect your right to appeal.  Objections should be noted for

20  consideration on the District Judge's motion calendar for the third Friday after they are filed.

21  Responses to objections may be filed within fourteen (14) days after service of objections.  If no

22  timely objections are filed, the matter will be ready for consideration by the District Judge on

23  **March 11, 2016**.

1        This Report and Recommendation is not an appealable order.  Thus, a notice of appeal

2    seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

3    assigned District Judge acts on this Report and Recommendation.

4        DATED this 18th day of February, 2016.

5

6                                                    _____
                                                     JAMES P. DONOHUE
7                                                    Chief United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION
PAGE - 22